1  ROBERT T. EGLET, ESQ.
   Nevada Bar No. 3402
2  ROBERT M. ADAMS, ESQ.
   Nevada Bar No. 6551
3  ARTEMUS W. HAM, ESQ.
   Nevada Bar No. 7001
4  ERICA D. ENTSMINGER, ESQ.
   Nevada Bar No. 7432
5  JOEL D. HENRIOD, ESQ.
   Nevada Bar No. 8492
6  CASSANDRA S.M. CUMMINGS, ESQ.
   Nevada Bar No. 11944
7  **EGLET ADAMS EGLET HAM HENRIOD**
   400 S. Seventh St., Suite 400
8  Las Vegas, NV  89101
   Ph: (702) 450-5400; Fax: (702) 450-5451
9  Email: eservice@egletlaw.com
   *Attorneys for Plaintiffs*

10

11                    **UNITED STATES DISTRICT COURT**

12                        **DISTRICT OF NEVADA**

13  RICHARD   JOHNSON,   an  individual;   and
    AMY JOHNSON, an individual,                        CASE NO.
14
                                                       
15          Plaintiffs,

16   vs.

17  3M    COMPANY;    3M    CHEMICAL          **COMPLAINT AND DEMAND FOR**
    OPERATIONS LLC; AGC CHEMICALS                    **JURY TRIAL**
18  AMERICAS,        INC.;        AMEREX
    CORPORATION; THE ANSUL COMPANY;
19  ARCHROMA U.S., INC.; ARKEMA, INC.;
    ASAHI KASEI PLASTICS AMERICA, INC.;
20  BASF CORPORATION; BUCKEYE  FIRE
    EQUIPMENT COMPANY; CARRIER  FIRE
21  & SECURITY AMERICAS, LLC F/K/A UTC
    FIRE     &     SECURITY     AMERICAS
22  CORPORATION, INC.; CARRIER FIRE &
    SECURITY    CORPORATION;    CARRIER
23  GLOBAL CORPORATION; CHEMDESIGN
    PRODUCTS, INC.; CHEMGUARD, INC.;
24  CHEMICALS    INCORPORATED;    THE
    CHEMOURS    COMPANY;    CLARIANT
25  CORPORATION;       CORTEVA,    INC.;
    DEEPWATER CHEMICALS, INC.; DUPONT
26  DE    NEMOURS    INC.;    DYNAX
    CORPORATION; EIDP, INC. F/K/A E.I. DU
27

28

1  PONT DE NEMOURS AND COMPANY;
   FIRE-DEX, INC.; FIRE-DEX, LLC; GLOBE
2  MANUFACTURING      COMPANY,      LLC;
   HONEYWELL SAFETY PRODUCTS USA,
3  INC.;   JOHNSON    CONTROLS,    INC.;
   JOHNSON CONTROLS FIRE PROTECTION
4  LP F/K/A JOHNSON CONTROLS FIRE
   PROTECTION LIMITED PARTNERSHIP;
5  KIDDE-FENWAL, INC.; KIDDE PLC INC.;
6  LION   GROUP,   INC.;   MINE   SAFETY
   APPLIANCES COMPANY, LLC; MSA
7  SAFETY INCORPORATED; NARCOTE LLC
8  D/B/A STEDFAST USA; NATIONAL FOAM,
   INC.;   NATION   FORD   CHEMICAL
9  COMPANY;      PBI     PERFORMANCE
10 PRODUCTS, INC.; SOUTHERN MILLS
   INC.; TYCO FIRE PRODUCTS, LIMITED
11 PARTNERSHIP;    RTX    CORPORATION
12 F/K/A   UNITED    TECHNOLOGIES
   CORPORATION;     W.L.    GORE    &
13 ASSOCIATES, INC.; DOES 1 through 20 and
   ROE  CORPORATIONS  1  through  20,
14 inclusive,

15      Defendants.

16

17

18      Plaintiffs, RICHARD JOHNSON and AMY JOHNSON, by and through their

19 undersigned attorneys, allege, upon information and belief, as follows:

20                    **I.   INTRODUCTION**

21      1.      Plaintiffs bring this action for monetary damages and appropriate equitable and

22 injunctive relief for harm resulting from exposure to toxic PFAS chemicals that were designed,

23 produced, promoted, supplied, sold and/or distributed by each of the Defendants and/or their

24 predecessors and subsidiaries.

25      2.      PFAS (per- and poly-fluoroalkyl substances) are man-made chemicals

26 characterized by a strong bond between fluorine and carbon. These toxic and carcinogenic

27 chemicals are used in a variety of manufactured products to repel heat, water, grease, and stains.

28

2

3.      PFAS are also known as "forever chemicals" because they do not break down easily. They can persist in the environment, and in the human body, for decades.

4.      Human exposure to PFAS can occur by ingesting, breathing, or touching the chemicals.

5.      Human exposure to PFAS has been linked to multiple adverse health outcomes including: altered metabolism and thyroid function; weakened immune system; kidney disease; thyroid disease; and increased risk of certain types of cancer.

6.      Defendants knew, or should have known, of the toxic nature of PFAS and the adverse health effects these substances have on human health.

7.      Defendants knew, or should have known, that PFAS chemicals remain in the body for decades, and present a significant ongoing risk to human health after exposure.

8.      Certain firefighting foams, known as "Class B foam," are manufactured with PFAS.

9.      Aqueous film-forming foam ("AFFF") is a Class B foam used by military and civilian firefighters to train for and fight liquid-based fires.

10.     Defendants collectively designed, produced, promoted, supplied, sold, distributed, or otherwise released into the stream of commerce, Class B foam for use within the State of Nevada, with the knowledge that it contained highly toxic PFAS which would expose end users to risk of severe adverse health effects.

11.     Further, Defendants collectively designed, produced, promoted, supplied, sold, distributed, or otherwise released into the stream of commerce, PFAS or PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts" or "turnout gear") for use within the State of Nevada, with the knowledge that they contained highly toxic PFAS which would expose end users to risk of severe adverse health effects.

12.     Turnout gear includes pants, jackets, hoods, helmets, boots, and gloves. PFAS chemicals are used in turnouts to make the materials heat, water, and stain resistant.

13.     High levels of PFAS have been found in firefighting turnouts, including in turnouts manufactured by Defendants MSA/Globe, Lion, and Honeywell.

3

14.     PFAS contained in the fabric of turnouts are broken down and released into the environment when exposed to heat. Firefighters are then exposed to PFAS through inhalation, ingestion, or skin contact.

15.     Despite knowing the toxic nature of PFAS, and the significant ongoing risk to human health caused by exposure to these substances, Defendants designed, produced, promoted, supplied, sold, distributed, or otherwise released into the stream of commerce, PFAS products, including Class B foam and turnouts, for use in firefighting training facilities and fire departments in Nevada and throughout the nation.

16.     Despite knowing the toxic nature of PFAS, and the significant ongoing risk to human health caused by exposure to these substances, Defendants did not notify or warn firefighters or the public that their turnouts and Class B foam contained PFAS, or that exposure to PFAS could result in serious health risks.

17.     At all times relevant to this Complaint, Defendants represented that their Class B foams and/or turnouts were safe.

18.     Plaintiff Richard Johnson ("Richard") has served the City of Henderson as a firefighter/EMT since 2000.

19.     Richard was frequently exposed to PFAS contained in the fabric of his required protective turnout clothing.

20.     Richard wore and used his turnout gear in the ordinary course of his job duties, as the turnouts were intended to be used, and in a foreseeable manner, exposing him to significant levels of PFAS.

21.     Richard did not know, and could not have known with the exercise of reasonable diligence, that the turnouts he wore in the course of his duties contained PFAS or PFAS containing materials.

22.     Richard did not know, and could not have known with the exercise of reasonable diligence, that he was routinely exposed to PFAS from the turnouts he wore in the course of his duties.

23.     Richard was also exposed to significant levels of PFAS through the use of Class B foams in the course of his duties.

24.     Richard worked with firefighting foam regularly throughout his career with the Henderson Fire Department. He was routinely exposed to firefighting foam during weekly trainings.

25.     Richard was exposed to PFAS through inhalation, ingestion, and skin contact during the preparation and use of Class B foams.

26.     Richard used Class B foams in the ordinary course of his job duties, as the foams were intended to be used, and in a foreseeable manner.

27.     Richard did not know, and could not have known with the exercise of reasonable diligence, that the Class B foams he used and were exposed to in the course of his duties contained PFAS.

28.     Richard did not know, and could not have known with the exercise of reasonable diligence, that he was routinely exposed to PFAS from the Class B foams he used and was exposed to in the course of his duties.

29.     Defendants' PFAS containing products were used by Richard in their intended manner, without significant change in the products' conditions.

30.     Richard was unaware of the dangerous properties of Defendants' Class B foams and turnouts. Richard relied on the Defendants' representations and instructions as to the handling and use of their Class B foams and turnouts.

31.     At all times relevant to this Complaint, Defendants represented that their Class B foams and turnout gear were safe.

32.     Richard's exposure to PFAS from Defendants' Class B foams and turnout products caused him to develop serious, life-threatening medical conditions, as alleged herein.

33.     Richard's exposure to PFAS or PFAS-containing materials will continue to pose a significant health threat into the foreseeable future due to the ongoing presence of the PFAS forever chemicals within his body.

5

34.     Due to Richard's injuries, caused by Defendants, Richard's wife Amy Johnson has suffered a permanent loss of consortium, disruption, and harm in her marriage, as alleged further herein.

35.     Plaintiffs seek to recover compensatory and punitive damages to recover for the injuries they sustained as a direct result of Richard's exposure to Defendants' Class B foam and turnout products during the course of his firefighting training and career.

36.     Richard further seeks injunctive, equitable, and declaratory relief.

## II.     JURISDICTION AND VENUE

37.     This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the amount of controversy exceeds $75,000.00, excluding interest and costs.

38.     Venue is proper in the District of Nevada under 28 U.S.C. §1391(b)(2) because it is a substantial part of the events or omissions giving rise to the claims occurred in the State of Nevada and Defendants conduct business within Nevada.

## III.     PARTIES

### A.   Plaintiffs

39.     Richard Johnson is a resident of this District in the County of Clark, State of Nevada, wherein he sustained the injuries alleged herein.

40.     Richard regularly used Defendants' Class B foams and turnout gear in training for and extinguishing fires, and was thereby exposed to PFAS and PFAS-containing materials contained therein.

41.     Richard's exposure to PFAS and PFAS-containing materials within Defendants' products caused and/or contributed to his illness and injuries alleged herein.

42.     Plaintiff Amy Johnson ("Amy") is a resident of this District in the County of Clark, State of Nevada, and is Richard's lawful wife.

43.     Amy brings a derivative claim for loss of consortium related to and arising from her husband's injuries alleged herein.

**B.   Defendants**

44.      Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M does business throughout the United States, including in Nevada. 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

45.      Defendant 3M Chemical Operations LLC is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M Chemical Operations LLC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

46.      Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation with its principal place of business in Exton, Pennsylvania. AGC does business throughout the United States, including in Nevada. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

47.      Defendant Amerex Corporation (a/k/a Alabama Amerex Corporation) ("Amerex") is an Alabama corporation with its principal place of business in Trussville, Alabama. Amerex does business throughout the United States, including in Nevada. Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

48.      Defendant The Ansul Company ("Ansul") is a Wisconsin corporation with its principal place of business in Marinette, Wisconsin. Ansul does business throughout the United States, including in Nevada. Ansul developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

49.     Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. Archroma does business throughout the United States, including in Nevada. Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

50.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business in King of Prussia, Pennsylvania. Arkema does business throughout the United States, including in Nevada. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

51.     Defendant Asahi Kasei Plastics America, Inc. ("Asahi Kasei") is a Delaware corporation with its principal place of business in Plymouth, Michigan. Asahi Kasei does business throughout the United States, including in Nevada. Asahi Kasei developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

52.     Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business in Florham Park, New Jersey. BASF does business throughout the United States, including in Nevada. BASF developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

53.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation with its principal place of business in Kings Mountain, North Carolina. Buckeye does business throughout the United States, including in Nevada. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

54.     Defendant Carrier Fire & Security Americas, LLC (f/k/a UTC Fire & Security Americas Corporation, Inc.) ("Carrier Fire") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida. Carrier Fire does business throughout the United States,

8

including in Nevada. Carrier Fire developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

55.     Defendant Carrier Fire & Security Corporation is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida. Carrier Fire & Security Corporation does business throughout the United States, including in Nevada. Carrier Fire & Security Corporation developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

56.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida. Carrier does business throughout the United States, including in Nevada. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

57.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business in Marinette, Wisconsin. ChemDesign does business throughout the United States, including in Nevada. ChemDesign developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

58.     Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business in Marinette, Wisconsin. Chemguard does business throughout the United States, including in Nevada. Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

59.     Defendant Chemicals Incorporated is a Texas corporation with its principal place of business in Baytown, Texas. Chemicals Incorporated does business throughout the United States, including in Nevada. Chemicals Incorporated developed, manufactured, marketed,

distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

60.    Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Chemours does business throughout the United States, including in Nevada. Chemours developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

61.    Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business in Charlotte, North Carolina. Clariant does business throughout the United States, including in Nevada. Clariant developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

62.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Corteva does business throughout the United States, including in Nevada. Corteva developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

63.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business in Woodward, Oklahoma. Deepwater does business throughout the United States, including in Nevada. Deepwater developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

64.    Defendant DuPont de Nemours Inc. (f/k/a DowDuPont, Inc.) ("DowDuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. DowDuPont does business throughout the United States, including in Nevada. DowDuPont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing fluorosurfactants to AFFF manufacturers. DowDuPont developed, manufactured, marketed, distributed, released, sold,

10

and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

65.     Defendant Dynax Corporation ("Dynax") is a New York corporation with its principal place of business in Pound Ridge, New York. Dynax does business throughout the United States, including in Nevada. Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

66.     Defendant EIDP, Inc. f/k/a E.I. Du Pont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont does business throughout the United States, including in Nevada. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

67.     Defendant Fire-Dex, Inc. is an Ohio corporation with its principal place of business in Cleaveland, Ohio. Fire-Dex, Inc. does business throughout the United States, including in Nevada. Fire-Dex, Inc. developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

68.     Defendant Fire-Dex, LLC is an Ohio corporation with its principal place of business in Medina, Ohio. Fire-Dex, LLC does business throughout the United States, including in Nevada. Fire-Dex, LLC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

69.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation with its principal place of business in Pittsfield, New Hampshire. Globe does business throughout the United States, including in Nevada. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada. Defendant

MSA Safety, Incorporated acquired Glob Holding Company, LLC and its subsidiaries (collectively "MSA/Globe") in 2017 and continues to do business under the Globe name.

70.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Honeywell does business throughout the United States, including in Nevada. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

71.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation with its principal place of business in Milwaukee, Wisconsin. Johnson Controls does business throughout the United States, including in Nevada. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

72.     Defendant Johnson Controls Fire Protection LP f/k/a Johnson Controls Fire Protection Limited Partnership ("Johnson Controls Fire Protection") is a Delaware corporation with its principal place of business in Boca Raton, Florida. Johnson Controls Fire Protection does business throughout the United States, including in Nevada. Johnson Controls Fire Protection developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

73.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde-Fenwal does business throughout the United States, including in Nevada. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

74.     Defendant Kidde PLC Inc. is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida. Kidde PLC Inc does business throughout the United

States, including in Nevada. Kidde PLC Inc. developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

75. Defendant Lion Group, Inc. ("LGI") is an Ohio corporation with its principal place of business in Dayton, Ohio. LGI does business throughout the United States, including in Nevada. LGI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

76. Defendant Mine Safety Appliances Company, LLC ("Mine Safety Appliances") is a Pennsylvania corporation with its principal place of business in Cranberry Township, Pennsylvania. Mine Safety Appliances does business throughout the United States, including in Nevada. Mine Safety Appliances developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

77. Defendant MSA Safety Incorporated ("MSA") is a Pennsylvania corporation with its principal place of business in Cranberry Township, Pennsylvania. MSA does business throughout the United States, including in Nevada. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

78. Defendant Narcote LLC d/b/a Stedfast USA ("Stedfast") is a Delaware corporation with its principal place of business in Piney Flats, Tennessee. StedFast does business throughout the United States, including in Nevada. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

79. Defendant National Foam, Inc. ("National Foam") is a Pennsylvania corporation with its principal place of business in West Chester, Pennsylvania. National Foam does business throughout the United States, including in Nevada. National Foam developed, manufactured,

13

marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

80.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its principal place of business in Fort Mill, South Carolina. Nation Ford does business throughout the United States, including in Nevada. Nation Ford MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

81.     Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. PBI does business throughout the United States, including in Nevada. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

82.     Defendant Southern Mills, Inc. (d/b/a Ten Cate Protective Fabrics USA) ("Tencate") is a Georgia corporation with its principal place of business in Senoia, Georgia. Tencate does business throughout the United States, including in Nevada. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

83.     Defendant Tyco Fire Products, Limited Partnership ("Tyco") is a Delaware corporation with its principal place of business in Exeter, New Hampshire. Tyco does business throughout the United States, including in Nevada. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

84.     Defendant RTX Corporation f/k/a United Technologies Corporation ("United Technologies") is a Delaware corporation with its principal place of business in Farmington, Connecticut. United Technologies does business throughout the United States, including in Nevada. United Technologies developed, manufactured, marketed, distributed, released, sold,

14

and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

85.     Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation with its principal place of business in Newark, Delaware. Gore does business throughout the United States, including in Nevada. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or firefighting foams throughout the United States, including in Nevada.

86.     The true names and capacities, whether individual, corporate, association or otherwise of Defendants DOES 1 through 20 and ROE CORPORATIONS 1 through 20, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants designated herein as DOES and/or ROES are responsible in some manner for the events and happenings herein referred to, and in some manner caused the injuries and damages proximately thereby to Plaintiffs, as alleged herein; that Plaintiffs will ask leave of this Court to amend this Complaint to insert the true names and capacities of said Defendants, DOES 1 through 20 and/or ROE CORPORATIONS 1 through 20, inclusive, when the same have been ascertained by Plaintiffs, together with the appropriate charging allegations, and to join such Defendants in this action.

## IV.     FACTUAL ALLEGATIONS

### A.  Richard's Exposure to PFAS-Containing Products.

87.     Richard began his career as an EMT/firefighter with the Henderson Fire Department in 2000.

88.     As a firefighter/EMT Richard responded to fires, medical emergencies, and rescue calls. To prepare for his essential and challenging work, Richard received extensive training in the preparation and use of Class B foam, and in the use of protective turnout gear.

89.     Richard was initially drawn to firefighting by his desire to help people during their times of need. He loved helping others and spending time with his family of firefighters in the fire station.

15

90.     Richard worked with firefighting foam regularly throughout his career with the Henderson Fire Department. He was routinely exposed to firefighting foam during weekly trainings.

91.     Richard was also frequently exposed to PFAS contained in the fabric of his required protective turnout clothing which he wore routinely and as instructed.

92.     In 2012, Richard was diagnosed with thyroid cancer as a result of exposure to PFAS contained in Defendants' firefighting foam and turnouts.

93.     Richard's exposure to PFAS contained in Defendants' firefighting foam and turnouts was a substantial factor, and the proximate cause, of his cancer and related injuries, as alleged herein.

94.     As a result of his thyroid cancer diagnosis, Richard was required to undergo surgical removal of his thyroid in 2012, and will be required to take thyroid medication for the rest of his life.

95.     Although initial indicators are that the thyroid surgery was successful, Richard continues to suffer from extreme lethargy and low energy which adversely affects both his professional and personal life.

96.     The effects of Richard's cancer treatment have significantly adversely altered almost every aspect of his daily life. Richard's energy and libido have decreased substantially because of his cancer treatment. His health has diminished due to his lack of energy which hinders his ability to exercise and has caused him to gain weight, an issue he had never dealt with prior to his thyroid removal. As a result of his weight-gain, Richard is now pre-diabetic.

97.     Richard has worked diligently with his endocrinologist to get his testosterone back to pre-surgery levels. Unfortunately, due to his cancer history, his doctors have advised him that testosterone therapy carries significant risk of cancer return and progression. Nevertheless, Richard's thyroid removal has diminished his quality of life so significantly that he may ultimately be forced to proceed with testosterone therapy, despite the risks.

98.     Richard's thyroid removal and associated lethargy has also forced him to step away from his dream job of Fire Captain, which he had reached prior to his cancer diagnosis. Since

2018, Richard has served in an administrative position as the Divisional Chief of Logistics for the Henderson Fire Department. In this role, Richard no longer has direct contact with the public or with his firefighting crew, contacts which drove him to be a firefighter in the first place.

**B.   Defendants' History of Manufacturing and Selling Toxic Products**

   **i.   Defendants History of Manufacturing and Selling Toxic Firefighting Foam**

99.     3M developed AFFF, a Class B firefighting foam, in the 1960s. 3M manufactured, marketed, and sold Class B firefighting foam from the 1960s to the early 2000s.

100.     National Foam and Tyco/Ansul manufactured, marketed, and sold Class B firefighting foam beginning in the 1970s.

101.     Chemguard and Dynax manufactured, marketed, and sold Class B firefighting foam beginning in the 1990s.

102.     Buckeye manufactured, marketed, and sold Class B firefighting foam beginning in the 2000s.

103.     In 2000, 3M announced it would phase out its production of Class B foam; however, 3M did not recall its Class B foam which it knew was being stockpiled and used by firehouses throughout the country.

104.     Defendants, including 3M, knew their customers warehoused large stockpiles of Class B foam. Even after Defendants fully understood the toxicity of PFAS, and the risks to human health resulting from exposure, Defendants concealed those facts from consumers and never informed their customers that Class B foam was unsafe or that it contained PFAS, and/or PFAS precursors.

105.     Even after Defendants fully understood the toxicity of PFAS, and the risks to human health resulting from exposure, Defendants continued to publicly claim that these products were safe. Further, Defendants concealed and/or suppressed information regarding the potential harms associated with PFAS, and proliferated industry funded research to support their claims that the products were safe.

### ii.  Defendants' History of Manufacturing and Selling Toxic Turnout Gear

106.    MSA/Globe began manufacturing, marketing, and selling turnout gear with DuPont's PFAS-containing flame resistant fabric in 1966 and continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by DuPont, Gore, Tencate, and PBI.

107.    Lion began manufacturing, marketing, and selling turnout gear in 1970, and continues to manufacture, market and sell turnout gear using PFAS-containing fabrics, including material supplied by Defendants DuPont and Gore.

108.    In 2015, DuPont spun-off its PFAS chemicals business to Defendant Chemours.

109.    Honeywell began manufacturing and selling turnout gear in 2008. One of the leading manufactures of turnouts, Honeywell manufactures, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

### C.  Defendants Knowingly Misrepresented the Safety of Their Products and Failed to Warn Plaintiff of the Dangers Associated with Exposure to PFAS.

110.    Despite knowing the toxic nature of PFAS, and the significant ongoing risk to human health caused by exposure to these substances, Defendants did not notify or warn firefighters or the public that their turnouts and Class B foam contained PFAS, or that exposure to PFAS could result in serious health risks.

111.    The packaging on Defendants' Class B foam containers contained no warnings that the foam contained PFAS or that harmful human exposure could occur when handled and used as intended.

112.    The PFAS containing turnouts manufactured, marketed, distributed and/or sold by Defendants, and used by Richard during his firefighting career, contained no warnings that the turnouts contained PFAS or that exposure to PFAS and PFAS containing materials could occur, resulting in serious harm to human health, when the turnouts were handled and used as intended.

113.    Defendants' Material Safety Data Sheets did not warn about PFAS or PFAS exposure and falsely stated that the materials within Class B foams were not known carcinogens.

114.    Defendants' failure to warn about the hazards of exposure to PFAS, or turnouts and Class B foams made with or containing PFAS continue to this day.

115.    Further, to this day, Defendants continue to make false claims and material misrepresentations concerning the hazards of exposure to PFAS or products made with or containing PFAS.

116.    For example, in 2019, Defendant MSA/Globe issued a public statement suggesting that its turnout gear was safe for use as intended because it supposedly met or exceeded all applicable industry standards.

117.    Similarly, in 2019, Defendant Lion issued a public statement suggesting that its turnout gear was safe for use as intended when properly maintained. Lion's statement indicated that it does not use two specifically identified PFAS chemicals in its turnout gear; however, Lion failed to note that other PFAS chemicals were still present in the gear.

118.    Defendants have all individually, either directly or through intermediaries, issued statements misrepresenting the safety of their PFAS containing products.

119.    Defendants, through their acts and omissions, controlled and influenced the information that was made publicly available regarding the health and safety concerns of human exposure to PFAS and PFAS-containing materials to minimize or discount those concerns.

120.    At all times relevant to this Complaint, Defendants, through their acts and omissions, concealed or withheld information from consumers, governmental agencies, and the public which, if made known, would have provided notice to firefighters, including Richard, of the risks of exposure to PFAS and the links between exposure and adverse health effects.

121.    As a result of Defendants' false claims, misrepresentations, and omissions, Richard did not know, and could not have known in the exercise of reasonable diligence, that he was exposed to PFAS and/or PFAS-containing materials through the use of Defendants' turnouts and Class B foams, causing serious illness as alleged herein.

## V.    STATUTES OF LIMITATIONS ARE TOLLED

122.    Plaintiffs incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

123.    Richard has diligently pursued and investigated the claims alleged in this Complaint. Through no fault of his own Richard did not learn, and could not have learned, the

19

factual bases for his claims or the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

**A. Discovery Rule**

124.     Richard could not have discovered through the exercise of reasonable diligence that Defendants' conduct, as alleged in this Complaint, would result in the harms alleged within the time for all applicable statutes of limitations.

125.     Among other things, Richard could not have known or appreciated the toxicity, persistence, and bioaccumulation of PFAS and PFAS-containing materials contained in Class B foam and turnout gear.

126.     Defendants had superior and/or exclusive knowledge of the toxicity, persistence, and bioaccumulation of PFAS and PFAS-containing materials, knowledge which they kept from the public for decades.

127.     Defendants knew, or should have known, that use of PFAS and PFAS-containing materials, including Class B form and turnout gear, was linked to increased risk of serious illness, including cancer, and that this information was material to firefighters such as Richard.

128.     Nevertheless, Defendants intentionally concealed this information from fire departments, governmental oversight and enforcement agencies, and firefighters, including Richard.

129.     Defendants knowingly misrepresented to firefighters, including Richard, that PFAS, PFAS-containing turnouts, and Class B foam were safe and non-toxic.

130.     Indeed, Defendants have repeatedly asserted that there is no basis to question the safety of their equipment because it meets industry required standards. However, Defendants failed to disclose that they worked to establish those industry standards based on incomplete and/or inaccurate information.

131.     As a result, Richard could not have reasonably discovered that his body had accumulated toxic PFAS in his blood from his use of PFAS-containing materials in Class B foam and/or turnouts, or that those PFAS were a substantial cause of his cancer, within the time of all applicable statutes of limitation.

20

132.    The causes of action alleged herein did not accrue until Richard discovered the toxic bioaccumulation associated with his use of Defendants' PFAS and/or PFAS-containing materials in Class B foam and/or turnouts.

133.    For these reasons, the discovery rule tolls all applicable statutes of limitations.

**B.   Equitable Estoppel**

134.    Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal the fact that their products were unsafe and/or continuously denied and concealed information linking those products to the injuries alleged by Richard.

135.    Defendants have continuously misrepresented the safety of PFAS and PFAS-containing materials. To this day, Defendants continue to make knowingly false assertions that their PFAS-containing products, including Class B foam and turnouts, are safe and non-toxic.

136.    Considering the harm that Defendants knew would result from exposure to PFAS and PFAS-containing materials, Defendants were under a continuous duty to disclose the true character, quality, and nature of those materials. Based upon the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

**C.   Intentional Concealment**

137.    Alternatively, Plaintiffs' claims are subject to equitable tolling, stemming from Defendants' knowingly and intentionally concealing the facts alleged herein. Defendants knew of the hazardous nature of PFAS and PFAS-containing materials, had material information pertinent to the discovery of those hazards, and concealed them from Plaintiffs and the public. As a result of Defendants' conduct, Richard did not know, and could not have known through the exercise of reasonable diligence, of his causes of action.

138.    Defendants undertook to purposefully conceal their tortious conduct by manipulating and distorting public information, knowledge, and facts; failing to make public or otherwise produce nonpublic information, over which Defendants had exclusive possession, dominion, and control, that would have revealed the truth; and by deliberately and intentionally concealing the truth.

139.    Defendants had in their possession and control information that PFAS and PFAS-containing materials, including their Class B foam and turnout products, were toxic and carcinogenic.

140.    Defendants were aware of the falsity of their misrepresentations.

141.    Defendants intended that their false statements and omissions be relied upon.

142.    Defendants cannot claim prejudice due to a late filing because this suit was filed upon discovering the facts essential to the Plaintiffs' claims.

143.    Thus, the running of all applicable statutes of limitation has been suspended with respect to any claims that Plaintiffs have sustained by virtue of the discovery rule doctrine, estoppel, and the intentional concealment doctrine.

## VI.    LEGAL CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Strict Products Liability – Dangerously Defective Product

144.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

145.    At all times mentioned herein, Defendants, their predecessors-in-interest and/or their alter-egos and/or entities they have acquired, were engaged in the business of designing, developing, manufacturing, marketing, promoting, distributing, and/or selling PFAS-containing Class B foams and/or turnouts.

146.    Defendants' PFAS-containing Class B foams and/or turnouts were defectively designed by Defendants.

147.    Defendants' PFAS-containing Class B foams and/or turnouts were provided to Richard in their original intended format, without any warnings with regard to the hazardous nature of the products.

148.    Richard used Defendants' PFAS-containing Class B foams and turnouts as intended. Defendants knew, or should have known, that Richard would use those products without knowledge of the fact that they contained PFAS, without knowledge of the fact that he would be

exposed to PFAS through their use, and without the ability to inspect for latent defects within the products.

149.    Defendants' PFAS-containing Class B foams and/or turnouts were defective and unsafe for their intended use due to design, manufacturing, production, and/or distribution defects. When used in a manner that was reasonably foreseeable by Defendants, Defendants' products failed to perform in a reasonably safe manner that an ordinary consumer would expect.

150.    The PFAS-containing Class B foams and turnouts that were designed, manufactured, marketed, distributed and/or sold by Defendants were hazardous to human health; therefore, Defendants' actions in manufacturing, marketing, distributing, and/or selling the products were unreasonably dangerous.

151.    Defendants did not include adequate warning to users, which made their PFAS-containing Class B foams and turnouts unsafe for their intended use. The defects in Defendants' products cause toxic PFAS to be released and accumulated in the bodies of users exposed to the products.

152.    Defendants failed to warn the public and consumers of the defect or the dangers in the foreseeable use of their Class B foams and/or turnouts.

153.    Defendants' PFAS-containing Class B foams and turnouts were defective when they left Defendants' possession, before being introduced into the stream of commerce by Defendants.

154.    Defendants' inherently dangerous product features are not necessary to consumers. Defendants could have designed, manufactured, supplied and/or distributed alternative designs or formulations that were safer and that did not contain PFAS. The benefits of changing Defendants' Class B foams and turnouts to make them safer for use are high and outweigh the costs.

155.    Defendants' PFAS-containing foams and turnouts presented a substantial and unreasonable risk of serious injury to consumers. The dangers associated with Defendants' use of PFAS in their Class B foams and turnouts outweigh the benefits of its use.

156.    As a direct and proximate cause of Defendants' defective Class B foams and turnouts, Kaylie has been deprived of the right to a continued relationship and the right to enjoy

Richard's continued love, comfort, companionship and society, all of which are damages recoverable by Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

157.    As a direct and proximate cause of Defendants' defective Class B foams and turnouts, Richard suffered severe personal injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

158.    As a direct and proximate cause of Defendants' defective Class B foams and turnouts, Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

159.    As a direct and proximate cause of Defendants' defective Class B foams and turnouts, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

160.    As a direct and proximate cause of Defendants' defective Class B foams and turnouts, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

161.    Defendants' conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of their products.

162.    Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

163.    As a direct and Proximate result of Defendants' conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

164.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

## SECOND CAUSE OF ACTION

### Strict Products Liability - Failure to Warn/Inadequate Warning

165.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

166.    At all times mentioned herein, Defendants, their predecessors-in-interest and/or their alter-egos and/or entities they have acquired, were engaged in the business of designing, developing, manufacturing, marketing, promoting, distributing, and/or selling PFAS-containing Class B foams and/or turnouts.

167.    At all times mentioned herein, Defendants' provided their PFAS-containing Class B foams and/or turnouts to consumers with no adequate warnings with regard to the risk that the foreseeable use of their PFAS-containing products would result in the contamination and bioaccumulation of the user's body.

168.    At all times mentioned herein, Defendants did not adequately warn firefighters or other users of the potential adverse health effects which could occur as a result of PFAS exposure resulting from the foreseeable use of their PFAS-containing products.

169.    At the time that Richard used Defendants' PFAS-containing Class B foams and turnouts, there were no adequate warnings that would reasonably catch his attention with regard to the risks of harm described herein.

170.    At the time that Richard used Defendants' PFAS-containing Class B foams and turnouts, there were no adequate warnings in a comprehensible language so as to give a fair indication of the risks of the use of those products.

171.    At the time that Richard used Defendants' PFAS-containing Class B foams and turnouts, there were no adequate warnings of sufficient intensity justified by the magnitude of the risk of their use.

172.    Defendants knew that consumers would use their PFAS-containing Class B foams and turnouts in the same manner as Richard did.

173.    As a direct and proximate cause of Defendants' failure to warn of the risks of the use of their PFAS-containing Class B foams and turnouts, Richard suffered severe personal

injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

174.    As a direct and proximate cause of Defendants' failure to warn of the risks of the use of their PFAS-containing Class B foams and turnouts, Kaylie has been deprived of the right to a continued relationship and the right to enjoy Richard's continued love, comfort, companionship and society, all of which are damages recoverable by Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

175.    As a direct and proximate cause of the conduct of Defendants, Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

176.    As a direct and proximate cause of the conduct of Defendants, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

177.    As a direct and proximate cause of Defendants' defective Class B foams and turnouts, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

178.    Defendants' conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of their products.

179.    Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

180.    As a direct and Proximate result of Defendants' conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

181.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

1

**THIRD CAUSE OF ACTION**

2

**Negligent Product Liability - Unreasonably Dangerous Product**

3      182.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint,

4  as though the same were fully set forth herein.

5      183.    Defendants owed a duty to Richard to exercise reasonable care in the manufacture,

6  design, and/or sale of their Class B foams and/or turnouts to ensure that they were safe for their

7  reasonably foreseeable use.

8      184.    Defendants negligently manufactured, designed, assembled, packaged, and/or

9  distributed their Class B foams and/or turnouts such that they were dangerous and unsafe for their

10  intended use and/or reasonably foreseeable use.

11      185.    Defendants' Class B foams and/or turnouts were more dangerous than would be

12  contemplated by the ordinary consumer and/or ordinary user having the ordinary knowledge

13  available in the Las Vegas community.

14      186.    It was technologically and economically feasible for Defendants to design safer

15  firefighting foams and turnouts.

16      187.    Fluorochemical-free and PFAS-free firefighting foams are technologically and

17  economically feasible.

18      188.    Numerous companies manufacture, distribute, market and/or sell fluorine-free

19  firefighting foams that have been shown to be effective alternatives to PFAS-containing Class B

20  foams.

21      189.    Safe fluorine-free turnout gear is also technologically and economically feasible.

22      190.    The economic and technological feasibility of fluorine-free foams and turnout gear

23  is based on technology that has been available for years.

24      191.    The alternative designs detailed above are far safer for firefighters and eliminate

25  the serious health risks that result from PFAS exposure.

26      192.    The use of these alternate designs would have prevented or reduced the harm

27  sustained by Richard resulting from the use of Defendants' PFAS-containing foams and turnouts.

28

27

193.    Defendants failed to exercise the amount of care in the design, manufacture, distribution, and/or sale of their Class B foams and/or turnouts, that a reasonably careful manufacturer, designer, and/or seller would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

194.    As a direct and proximate cause of Defendants' negligence, Richard suffered severe personal injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

195.    As a direct and proximate cause of Defendants' negligence, Kaylie has been deprived of the right to a continued relationship and the right to enjoy Richard's continued love, comfort, companionship and society, all of which are damages recoverable by Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

196.    As a direct and proximate cause of the conduct of Defendants', Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

197.    As a direct and proximate cause of the conduct of Defendants, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

198.    As a direct and proximate cause of the conduct of Defendants, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

199.    Defendants' conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of their Class B foams and turnouts.

200.    Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

201.    As a direct and Proximate result of Defendants' conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

202.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

## FOURTH CAUSE OF ACTION

### Negligent Product Liability - Failure to Include an Adequate Warning

203.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

204.    Defendants owed a duty to Richard to exercise reasonable care in the warning of the use of their Class B foams and turnouts, and to ensure that those products were safe for their reasonably foreseeable use.

205.    Defendants' negligently manufactured, designed, packaged, and/or distributed their Class B foams and turnouts such that they contained no adequate warnings of the potential dangers inherent with their use, and as such, were dangerous and unsafe.

206.    Defendants failed to provide sufficient warning to purchasers and end users that their Class B foams and turnouts could cause PFAS to be released, resulting in exposure and bioaccumulation of toxic chemicals in the human body.

207.    Defendants' Class B foams and turnouts failed to perform in a manner reasonably to be expected in light of their nature and intended function and were more dangerous than would be contemplated by the ordinary consumer and/or ordinary user having the ordinary knowledge available in the Las Vegas community.

208.    Defendants failed to exercise the amount of care in the design, development, manufacture, instruction, marketing, promotion, distribution, and selling of their Class B foams and turnouts that a reasonably careful company would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

209.   Richard was a foreseeable user of Defendants' Class B foams and turnouts, and used the products in a foreseeable manner.

210.   Defendants knew, or should have known, that their Class B foams and turnouts can be dangerous and harmful when used in a reasonably foreseeable manner.

211.   A reasonable company in Defendants' position would have warned its users about the safety risks associated with the use of foams and turnouts containing PFAS.

212.   Defendants breached their duty by failing to provide adequate warnings to Richard, as set forth above.

213.   As a direct and proximate cause of Defendants' negligence, Richard suffered severe personal injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

214.   As a direct and proximate cause of Defendants' negligence, Kaylie has been deprived of the right to a continued relationship and the right to enjoy Richard's continued love, comfort, companionship and society, all of which are damages recoverable by Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

215.   As a direct and proximate cause of the conduct of Defendants, Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

216.   As a direct and proximate cause of the conduct of Defendants, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

217.   As a direct and proximate cause of the conduct of Defendants, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

218.    Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

219.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

## FIFTH CAUSE OF ACTION

### Negligent Distribution and Marketing

220.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

221.    At all times mentioned herein, Defendants owed a duty to Richard to manufacture, market, package and/or distribute their Class B foams and/or turnouts with adequate directions and adequate warnings.

222.    As a result of Defendants' negligent manufacturing, marketing, packaging, and/or distributing, Defendants breached their duty to Richard, by failing to warn and protect him from foreseeable harm, resulting in Richard's injuries and damages as alleged herein.

223.    As a direct and proximate cause of Defendants' negligence, Richard suffered severe personal injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

224.    As a direct and proximate cause of Defendants' negligence, Kaylie has been deprived of the right to a continued relationship and the right to enjoy Richard's continued love, comfort, companionship and society, all of which are damages recoverable by Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

225.    As a direct and proximate cause of the conduct of Defendants, Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

226.   As a direct and proximate cause of the conduct of Defendants, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

227.   As a direct and proximate cause of the conduct of Defendants, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

228.   Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

229.   Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

## SIXTH CAUSE OF ACTION

### Breach of the Implied Warranty of Fitness for a Particular Purpose

230.   Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

231.   At all times relevant herein, Defendants were engaged in designing, developing, manufacturing, marketing, promoting, distributing, and/or selling PFAS-containing Class B foams and/or turnouts.

232.   At all times relevant herein, Defendant knew that their PFAS-containing Class B foams and/or turnouts were being used by the firefighters and other consumers, and Defendants impliedly warranted that those products were safe and fit for the purpose for which they were ordinarily used.

233.   Richard reasonably relied upon the skill and judgment of Defendants as to whether Defendants' PFAS-containing Class B foams and turnouts were safe and fit for their intended use and purpose.

32

234.   Contrary to such implied warranty, Defendants' PFAS-containing Class B foams and turnouts were not safe or fit for their intended use or purpose, and were unreasonably dangerous and unfit for use by firefighters and the general public.

235.   Richard was exposed to PFAS by using Defendants' PFAS-containing Class B foams and turnouts in the course of his firefighting activities, without knowledge of the products' dangerous and hazardous properties.

236.   As a direct and proximate cause of Defendants' conduct, Richard suffered severe personal injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

237.   As a direct and proximate cause of the conduct of Defendants, Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

238.   As a direct and proximate cause of the conduct of Defendants, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

239.   As a direct and proximate cause of the conduct of Defendants, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

240.   Defendants' conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of their PFAS-containing products.

241.   As a direct and Proximate result of Defendants' conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

33

242.    Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

243.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

**SEVENTH CAUSE OF ACTION**

**Negligence**

244.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

245.    Defendants owed a duty to Plaintiffs to exercise reasonable care in the design, development, manufacture, instruction, marketing, promotion, distribution, and selling of their Class B foams and turnouts, so as not to create an unreasonable risk of harm from use by the public and firefighters, including Richard.

246.    At all times relevant, Defendants knew, or should have known, that their Class B foams and turnouts posed an unreasonable risk of harm to firefighters and the public.

247.    At all times relevant, Defendants knew, or should have known, that firefighters and other users of their Class B foams and turnouts would not realize the potential risks and dangers of using those products.

248.    Defendants failed to exercise the amount of care in the design, development, manufacture, instruction, marketing, promotion, distribution, and selling of their Class B foams and turnouts that a reasonably careful company would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

249.    The manner and extent of Richard's use of Defendants' turnouts and Class B foams was reasonably foreseeable and/or facilitated and encouraged by Defendants.

250.    Defendants knew, or should have known, that their Class B foams and turnouts can be dangerous and harmful when used in a reasonably foreseeable manner.

34

251.     Defendants breached their duties of care through their actions, or failures to act, in the design, development, manufacture, instruction, marketing, promotion, distribution, and selling of their Class B foams and turnouts.

252.     Defendants breached their duties by engaging in the acts described in this complaint.

253.     As a direct and proximate cause of Defendants' negligence, Richard suffered severe personal injuries including pain and suffering and emotional distress, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

254.     As a direct and proximate cause of Defendants' negligence, Kaylie has been deprived of the right to a continued relationship and the right to enjoy Richard's continued love, comfort, companionship and society, all of which are damages recoverable by Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

255.     As a direct and proximate cause of the conduct of Defendants, Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

256.     As a direct and proximate cause of the conduct of Defendants, Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

257.     As a direct and proximate cause of the conduct of Defendants, Richard now has limited occupational and recreational capacity, which has caused and will continue to cause a loss of wages and loss of future earning capacity, which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

258.     Due to the systematic and repetitive nature of Defendants' violations, Defendants breached their duties in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

259.  Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

## EIGHTH CAUSE OF ACTION
### Misrepresentation

260.  Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

261.  A party who suppresses or omits a material fact which the party is bound in good faith to disclose makes an indirect representation that such fact does not exist. *Nelson v. Heer*, 123 Nev. 217, 163 P.3d 420 (Nev. 2007) (quoting *Midwest Supply, Inc. v. Waters*, 89 Nev. 210, 212-13, 510 P.2d 876, 878 (1973).

262.  Defendants made false and misleading representations and/or omitted material facts regarding the risk to user safety associated with the risks of their PFAS-containing Class B foams and/or turnouts, which they were obligated in good faith to disclose.

263.  Defendants misrepresented and downplayed risks that were known to them regarding the health hazards associated with Class B foams, PFAS, and PFAS-containing materials, and the harms associated with human exposure resulting from their intended and/or common use.

264.  Defendants knew, or in the exercise of reasonable care should have known, that the misleading representations and/or omissions were false and/or without a sufficient basis for making.

265.  Defendants intended to induce consumers and firefighters such as Richard to act on the false and misleading representations or material omissions.

266.  Richard justifiably relied on Defendants' false representations and/or omissions.

267.  Richard sustained actual and consequential damages, which he is entitled to recover, as a result of his reliance on Defendants' false representations or omissions.

268.  As a direct and proximate cause of Defendants' false representations or omissions, Richard suffered severe personal injuries including pain and suffering and emotional distress, all

1  of which are damages recoverable by Richard in an amount in excess of Seventy-Five Thousand

2  Dollars ($75,000.00).

3      269.   As a direct and proximate cause of Defendants' false representations or omissions,

4  Kaylie has been deprived of the right to a continued relationship and the right to enjoy Richard's

5  continued love, comfort, companionship and society, all of which are damages recoverable by

6  Kaylie in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

7      270.   As a direct and proximate cause of Defendants' false representations or omissions,

8  Richard is entitled to recover damages for the pain, suffering, anxiety, disability, emotional

9  distress, physical injuries and medical treatment, both past and future, all of which are damages

10  recoverable by Richard in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

11      271.   As a direct and proximate cause of Defendants' false representations or omissions,

12  Richard suffered a loss of enjoyment of life, all of which are damages recoverable by Richard in

13  an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

14      272.   As a direct and proximate cause of the conduct of Defendants, Richard now has

15  limited occupational and recreational capacity, which has caused and will continue to cause a loss

16  of wages and loss of future earning capacity, which are damages recoverable by Richard in an

17  amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

18      273.   Defendants' actions were conducted in an oppressive, malicious, despicable, gross

19  and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for

20  Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

21      274.   Plaintiffs have been forced to retain the services of an attorney to represent them in

22  this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

23                  **NINTH CAUSE OF ACTION**

24                  **Loss of Consortium (Amy Johnson)**

25      275.   Plaintiffs incorporate all other paragraphs of the Complaint as if those paragraphs

26  were fully incorporated herein.

27      276.   Plaintiff Amy Johnson brings a loss of consortium claim under Nevada law, arising

28  from her husband Richard's injuries as alleged herein.

37

277.    Amy and Richard enjoyed a valid and lawful marriage in Nevada at the time of the Subject Incident.

278.    Amy's husband Richard suffered tortious injury as described herein.

279.    Due to Richard's injuries, caused by Defendants, Amy has suffered a permanent loss of consortium, disruption, and harm in her marriage, including but not limited to loss of her injured husband's companionship, conjugal relationship, sexual relationship, emotional support, and marital harmony.

280.    Due to Richard's injuries, caused by Defendants, Amy was forced to take on gainful employment outside of the home to make ends meet. The necessity for Amy to work outside of the home was to the determinant of her domestic services including child rearing, meal preparation, cleaning, and attending to the emotional needs of her family.

281.    Due to Richard's injuries, caused by Defendants, Amy and Richard experience emotional distress, worrying, and anxiousness concerning Richard's unknown health status, all of which has adversely affected their marital harmony.

282.    Defendants' actions were conducted in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Defendants' conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

283.    As a direct and proximate result of the actions and conduct of the Defendants injuring her husband Richard, Amy is entitled to damages for loss of consortium in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs the following relief:

1.    General damages in an amount in excess of $75,000.00;

2.    Compensatory damages in an amount in excess of $75,000.00;

3.    Special damages in an amount in excess of $75,000.00;

4.    Medical and incidental expenses incurred and to be incurred;

5.    Punitive damages in an amount to be determined at trial;

38

6. Damages for lost earnings and diminished earning capacity and other economic damages in an amount to be determined at trial.

7. Damages for past and future pain, suffering, mental anguish, and loss of enjoyment of life;

8. Damages for a loss of past and future household services;

9. For pre- and post-judgment interest as provided by law;

10. Costs of suit, reasonable attorney fees, interest incurred herein;

11. Equitable and injunctive relieve to ensure that Defendants refrain from continuing to harm others; and

12. Any such other and further relief as is just and proper.

Dated this 18th day of July 2024.

By:   */s/ Robert M. Adams*
ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
ARTEMUS W. HAM, ESQ.
Nevada Bar No. 7001
ERICA D. ENTSMINGER, ESQ.
Nevada Bar No. 7432
JOEL D. HENRIOD, ESQ.
Nevada Bar No. 8492
CASSANDRA S.M. CUMMINGS, ESQ.
Nevada Bar No. 11944
**EGLET ADAMS EGLET HAM HENRIOD**
400 S. Seventh St., Suite 400
Las Vegas, NV  89101
Ph: (702) 450-5400; Fax: (702) 450-5451
Email: eservice@egletlaw.com
*Attorneys for Plaintiffs*

39

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff, by and through her attorneys of record, hereby demands a jury trial of all of the

3    issues in the above matter.

4        DATED this 18th day of July 2024.

5

6                  By:    */s/ Robert M. Adams*

ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402

7                          ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551

8                          ARTEMUS W. HAM, ESQ.
Nevada Bar No. 7001

9                          ERICA D. ENTSMINGER, ESQ.
Nevada Bar No. 7432

10                       JOEL D. HENRIOD, ESQ.
Nevada Bar No. 8492

11                       CASSANDRA S.M. CUMMINGS, ESQ.
Nevada Bar No. 11944

12                     **EGLET ADAMS EGLET HAM HENRIOD**
400 S. Seventh St., Suite 400

13                     Las Vegas, NV 89101
Ph: (702) 450-5400; Fax: (702) 450-5451

14                     Email: eservice@egletlaw.com

15                     *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

40